# In the United States Court of Federal Claims

<table>
<tr><td>

KIDSTON HOLDINGS GROUP, LLC,

      Plaintiff,

      v.

THE UNITED STATES,

      Defendant.

</td><td>

No. 25-734
Filed July 17, 2026

</td></tr>
</table>

Joseph Zito, DNL Zito, Washington, DC, for plaintiff.
Catherine M. Yang, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**
**Granting the government's motion to dismiss**

Kidston Holdings Group, LLC alleges that the Federal Emergency Management Agency breached a contract with Kidston and seeks $250,000 in damages. Kidston alleges that it entered into a contract with FEMA to provide trucks to help with the FEMA response to Hurricane Hilary in August 2023. When a Kidston truck arrived at a FEMA distribution center, a FEMA officer paid the standard rate for a truck that was ordered but not used and told the driver to leave. The government moves to dismiss the complaint for failure to state a claim upon which relief may be granted. Because Kidston does not allege a valid contract, and, even if there were a contract, Kidston does not present a viable breach-of-contract claim, the court will grant the government's motion to dismiss.

I.    **Background**

    A.    **FEMA rules provide a process for FEMA to request services from transportation service providers**

FEMA routinely requests trucks and drivers from transportation service providers. FEMA lists its "baseline rules" in a document called the FEMA Standard Tender of Service. *FEMA Standard Tender of Service*, https://www.fema.gov/sites/default/files/documents/fema_tsp-2023-stos.pdf (effective June 1, 2023). Those rules apply when "FEMA leadership ... direct[s] FEMA transportation staff to work with" providers. *Id*. § 1.1. Providers are instructed to "read all the FEMA Tender of Service Program documents carefully." *Id*. Providers must follow the Standard Tender of Service rules "in conjunction with the FEMA Uniform Rules Tariff ... and FEMA Requests for Offers." *Id.*

Providers sign an agreement and certification statement, certifying that they "have read and will comply with all of the provisions contained in the following governing publications": the FEMA Standard Tender of Service, the FEMA Uniform Rules Tariff, and "[a]ll applicable requirements for filing rate tenders and rate quotations as described in 41 C.F.R. Parts 102-117 and 102-118." *FEMA Standard Tender of Service*, Appendix A at § 10(A)(1) (titled "FEMA Transportation Service Provider (TSP) Agreement and Certification Statement").

FEMA requests transportation services on a regular cycle and also through spot bid opportunities. *FEMA Standard Tender of Service*, § 3. "FEMA issues Spot Bid opportunities via email to groups of " providers. *Id*. § 3(2). After providers respond, "FEMA will reach out to [the awardee or awardees] directly" and will then share with the unsuccessful offerors the names of the awardees. *Id*.

FEMA then issues what is called a bill of lading to any awardee. *FEMA Standard Tender of Service*, § 1.5.1. "Bills of lading … are required [for FEMA] to acquire freight … and other

2

transportation services." 41 C.F.R. § 102-117.35. The bill of lading "establishes the terms of contract" between FEMA and the awardee. *FEMA Standard Tender of Service*, § 1.5.1; *see also* 41 C.F.R. § 102-117.10 (stating that a bill of lading "specifies contract terms and conditions"). And each driver for the awardee must have the bill of lading when arriving for the job. *FEMA Standard Tender of Service*, § 2.2.3 (referring to a bill of lading as "necessary documentation"); *see also* *FEMA Uniform Rules Tariff*, § 2.2, https://www.fema.gov/sites/default/files/documents/fema_tsp-uniform-rules-tariff-2023.pdf (effective June 1, 2023) ("All drivers transporting Government shipments on behalf of a [provider] shall have in their physical possession a copy of the Bill of Lading … that verifies their affiliation with the [provider] named on the" bill of lading.).

Sometimes FEMA will request services but then later decide to cancel. Under FEMA's rules, the agency may "elect[] to cancel a transportation order after a [provider] has arrived at the origin" and will "reimburse the [provider] $210 for each truck that arrived" but was not used. *FEMA Uniform Rules Tariff*, § 3.13.[1] This is referred to as a "truck ordered, not used" payment. *Id.*

## B.    Kidston sent trucks for FEMA's use in response to Hurricane Hilary

Kidston alleges that it is a "broker of trucking services that produces trucks and drivers in response to emergency requests from the federal government and specifically FEMA." ECF No. 40 at 2 [¶4]. Craig Kidston owns and operates the company out of Stryker, Ohio. ECF No. 42 at 3.

At 11:59 am on August 18, 2023, Francisco Leon-Munoz, a transportation management specialist for FEMA, sent an email "solicitation for bids" to a group of transportation service providers, including Kidston, requesting "20 power only shuttles" to transport supplies from FEMA's

---

[1] The reimbursement rate has since increased to $260. *See FEMA Uniform Rules Tariff*, https://www.fema.gov/sites/default/files/documents/fema_uniform-rules-tariff_2026.pdf (effective July 1, 2026).

3

warehouse in Tracy, California to a nearby California airport, in response to Hurricane Hilary. ECF No. 40 at 2 [¶5]; ECF No. 40-1 at 1-2. It was a spot bid opportunity. ECF No. 42 at 3. Mr. Leon-Munoz requested that the shuttles arrive the next day, August 19, at 7:00 am. ECF No. 40-1 at 1-2. He set a response deadline of August 18 at 1:00 pm. *Id*. at 1. Mr. Kidston responded, "Received," at 12:05 pm. *Id*. at 3. Mr. Kidston followed up, "I've got you covered at $1500 per truck-per day for up to 30 days on up to 20 power only shuttles at [distribution center] Tracy." *Id*.

Mr. Leon-Munoz then sent the same group of providers an updated solicitation at 12:46 pm: "[T]his mission now requires 15 power only [shuttles] … by 1400 [2:00 pm] local." ECF No. 40-1 at 3-4. Four minutes later, Mr. Kidston responded, "Acknowledged," and then three minutes after that Mr. Kidston sent a new offer, "$1900 per shuttle truck-per day reporting to [distribution center] Tracy by 1400 [2:00 pm] local time today on 15 power only shuttles." *Id.* at 4-5. Mr. Leon-Munoz emailed the group at 1:16 pm, awarding the contract to a company called KCH Transportation. *Id.* at 5-6 ("Good afternoon all, this bid is now and has been awarded to KCH [Transportation]. FEMA Thanks all for you[r] support."). Three minutes later, Mr. Kidston emailed Mr. Leon-Munoz, saying, "Let me know asap if you need additional units. I'll be all over it." *Id.* at 7. Mr. Leon-Munoz replied, "I will let you know thank you." *Id*.

Kidston alleges that the next day, August 19, Mr. Kidston "received a phone call from [Mr. Leon-Munoz] asking if Kidston was still able to provide the trucks at his previously quoted rate of $1,900.00 per day." ECF No. 40 at 2 [¶7]. Kidston alleges that in "the same phone call," Mr. Kidston "confirmed and accepted" Mr. Leon-Munoz's offer and that "a verbal agreement was formed." *Id*. at 2 [¶8]. Four hours after the call, Kidston "booked three drivers to arrive at the FEMA Warehouse." *Id.* at 2 [¶9]. At 4:46 pm, Mr. Kidston emailed Mr. Leon-Munoz, saying, "I

4

need the [bill of lading] numbers to give these drivers." ECF No. 40-1 at 8. At 5:10 pm, Mr. Kidston emailed Mr. Leon-Munoz again, adding two other email addresses and stating, "I've already booked three Power Only Units for you. All of them are less than an hour out. The agreed on rate is $1900 per truck, per day. I need the [bill of lading] numbers for the drivers for pickup." *Id*.

Almost an hour later, at 6:04 pm, Mr. Kidston wrote again: "Your guys on the ground at the [distribution center] Tracy are telling my driver that they need him to pull the last van. I told him not to leave the [distribution center] and wait. We've got trucks ready if and when you need them. I'm not handing my guys off to another broker like [Mr. Leon-Munoz] suggested." ECF No. 40-1 at 8. Four minutes later, Mr. Leon-Munoz responded, copying the other two email addresses, "Please have your driver leave, I will call the [distribution center] and let them know." *Id*. at 8-9. One minute later, Mr. Kidston responded, "Copy. He's pulling out now. They're still saying they need him though. We'll be close by if things change on your end." *Id.* at 9.

Then, at 6:27 pm, Mr. Kidston wrote, "Your guys on the ground at [distribution center] Tracy made my driver sit down in the waiting room when he tried to leave again. What do you want us to do now?" ECF No. 40-1 at 9. St Francis Peters, a supervisory transportation management specialist, responded to Mr. Kidston at 6:51 pm, "We got it covered sir." *Id*. One minute later, Mr. Kidston replied, "My driver pulled out of the gate. Then your people at [distribution center] Tracy ran out of the gate yelling for him to [go] back inside the gate again. So now he's inside the gate again. Are you still sending me the [bill of lading] for [a truck ordered, not used] or do you want my driver to haul a load for you now?" *Id*. at 9-10. Two minutes later, Mr. Peters responded, "It was sent to you already, please make sure that the driver get[s] this signed at the [distribution center] and turned into you, thanks." *Id*. at 10. Two minutes later, Mr. Kidston wrote

back, "Copy. We're all clear on it now. Thanks." *Id*. at 10. Kidston then received a $210 payment from FEMA for the truck that it sent. ECF No. 40-3.

###   C.      Kidston alleges breach of contract and fraudulent misrepresentation

Mr. Kidston, proceeding pro se and representing his company, filed a complaint in this court to recover $1,140,000 "plus the maximum interest allowable" for supplying "power only shuttles" to FEMA. ECF No. 1 at 3. After finding an attorney through the court's pro bono attorney referral program, Kidston (this time the company alone) eventually filed a third amended complaint, now seeking $250,000 in damages. ECF No. 40.

Kidston alleges that the government breached a verbal contract between the company and the government, as articulated by Mr. Leon-Munoz, a FEMA representative. ECF No. 40 at 4 [¶22], 5 [¶28]. As an alternative, in its brief, Kidston alleges that the government breached a written contract, as there must have been an initial bill of lading because FEMA was able to produce a truck-ordered-not-used bill of lading to pay Kidston $210 for the driver who arrived but did not carry any freight. ECF No. 42 at 5-6. Kidston also alleges fraudulent misrepresentation. ECF No. 40 at 5 [¶27]. According to Kidston, the contract "prompted Kidston to perform by procuring trucks to complete FEMA's mission during Hurricane" Hilary. *Id*. at 4 [¶22]. Kidston seeks $200,000 for "the benefit of services performed" and $50,000 in "consequential damages." *Id*. at 5.

The government moves to dismiss the third amended complaint, arguing that no contract existed and, even if one did, FEMA was permitted to cancel the order under the rules that allow it to pay $210 for a truck that is ordered but not used. ECF No. 41. The court held an oral argument.

## II.     Discussion

The government moves to dismiss under rule 12(b)(6) of the Rules of the Court of Federal Claims. ECF No. 41. Rule 12(b)(6) requires a plaintiff to bring a claim on which this court can

grant relief. On a motion to dismiss under rule 12(b)(6), the court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The court need not accept the parties' legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007)). "A complaint must be dismissed under Rule 12(b)(6) when the facts asserted do not give rise to a legal remedy, or do not elevate a claim for relief to the realm of plausibility." *Laguna Hermosa Corporation v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (citing *Lindsay*, 295 F.3d at 1257, and *Iqbal*, 556 U.S. at 679).

Under the Tucker Act, this court has jurisdiction over claims against the United States based on contracts "either express or implied in fact." *Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996); *see* 28 U.S.C. § 1491(b). "Mutuality of intent is a threshold condition for contract formation," so a "party must show an objective manifestation of voluntary, mutual assent to enter into a binding contract." *Boyd v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025) (quotation marks omitted). "The party alleging the existence of a contract has the burden of demonstrating a mutual intent to contract including an offer, an acceptance, and consideration." *Harbert / Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed. Cir. 1998) (quotation marks omitted). In a contract claim against the government, the plaintiff must also show that "the Government representative whose conduct is relied upon … [had] actual authority to bind the government in contract." *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (quotation marks omitted).

To establish a breach of contract, the plaintiff must show "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage District v. United States*, 877

F.2d 957, 959 (Fed. Cir. 1989). "[T]he initial step for proving a breach of contract claim" is "proving that a contract existed." *D & N Bank v. United States*, 331 F.3d 1374, 1382 (Fed. Cir. 2003). If there is a contract, "the court must interpret the contract's provisions to ascertain whether the facts plaintiff alleges would, if true, establish a breach." *Bell / Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014).

### A.    Kidston's third amended complaint fails to allege the existence of a valid contract

The government argues that Kidston fails to state a claim for breach of contract because his "pleading[s] and exhibits show" that FEMA "awarded the solicitation at issue to another bidder." ECF No. 41 at 1. Although Kidston acknowledges that it did not win the spot bid award (ECF No. 40 at 2 [¶6]), it alleges that Kidston and FEMA formed a separate contract when Mr. Kidston "received a phone call" from Mr. Leon-Munoz "asking if Kidston was still able to provide the trucks at his previously quoted rate" (*id*. at 2 [¶7]). Kidston further asserts that, because FEMA issued a truck-ordered-not-used bill of lading, there must have been an initial written bill of lading, "which did award Kidston the entire contract, however brief[ly]." ECF No. 42 at 5.

### 1.    There was no written contract

Kidston primarily argues that the existence of a truck-ordered-not-used bill of lading, which "explicitly lists Kidston Holdings Group LLC as" the provider, "clearly establish[es] that a contract was entered into between the parties." ECF No. 42 at 5.

But in this case no bill of lading existed at least until after Kidston's truck arrived and FEMA employees wanted to send the truck away. FEMA issued the truck-ordered-not-used bill of lading only to be able to pay Kidston for sending a truck that FEMA did not use. Kidston does not allege that Kidston's driver or anyone else saw a bill of lading before that.

A bill of lading is the "contract of carriage" "between the [provider] and the agency." 41 C.F.R. § 102-117.10; *see also FEMA Standard Tender of Service*, § 1.5.1; ECF No. 41 at 6. A bill of lading must provide a "list of merchandise being transported," "the conditions that apply to its transportation," and "the type, quantity, and destination of the good being carried." *FEMA Uniform Rules Tariff*, Appendix A. A truck-ordered-not-used bill of lading, on the other hand, is a document that FEMA provides when sending away a truck that arrived but was not used. *Id.* § 3.13.

Kidston does not allege that it received a bill of lading with "the type, quantity, and destination of the good being carried." *FEMA Uniform Rules Tariff*, Appendix A; *see* ECF No. 40-1 at 8. Kidston instead argues that the truck-ordered-not-used bill of lading implies that an initial bill of lading must have existed. ECF No. 42 at 5; *see* ECF No. 40-3. But the implication that a written contract exists is not enough to establish the existence of the contract, especially when no one has any evidence of the written contract's ever having existed. *See, e.g.*, *D & N Bank*, 331 F.3d at 1377 (explaining that "there needs to be something more than a cloud of evidence … to prove a contract").

The emails attached to the complaint support that FEMA issued the truck-ordered-not-used bill of lading only so Kidston would remove its truck from the distribution center. ECF No. 40-1 at 8-10; ECF No. 41 at 5. Although FEMA issued a truck-ordered-not-used bill of lading, there was not necessarily an initial bill of lading preceding it. The truck-ordered-not-used bill of lading does not show an intent to contract for transportation services but instead shows that FEMA officials approved of the decision to compensate Kidston for the truck that arrived. *See D & N Bank*, 331 F.3d at 1379.

### 2.    There was no verbal contract

In the alternative, Kidston argues that a "verbal agreement was formed based upon the solicitation and verbal representations of " Mr. Leon-Munoz, a FEMA officer. ECF No. 40 at

9

2 [¶8]. Taking Kidston's allegations as true, the discussion between Mr. Kidston and Mr. Leon-Munoz still does not allege a valid contract for three independent reasons.

First, this dispute arises out of a spot bid opportunity. ECF No. 41 at 3-4. FEMA's rules require FEMA to issue all spot bid contracts in writing, by email. *FEMA Standard Tender of Service*, § 3(2). Each step of the spot bid process, from the initial solicitation through the notice of the award, must be memorialized by email. *See id.* § 3. FEMA also must issue an initial set of written bills of lading to the awardee. *Id.* § 1.5.1; *see also* ECF No. 41 at 3. A bill of lading is a "mandatory" part of the process (41 C.F.R. § 102-117.10), and any awardee's driver must have the bill of lading with him when he arrives for the job. *FEMA Standard Tender of Service*, § 2.2.3; *see also FEMA Uniform Rules Tariff*, § 2.2; 41 C.F.R. § 102-117.35. At the oral argument, Kidston's attorney agreed that Kidston had signed the agreement and certification statement indicating that the company understood those rules. Kidston thus understood that it could not enter into a verbal contract with FEMA to provide trucks, and therefore neither party could intend to be bound by any such verbal agreement.

Verbal discussions with the government are sometimes permitted. But if, after a verbal assurance, the parties do not follow through with "all the steps ... that the agency procedure requires … there is no intent to be bound." *New American Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1080 (Fed. Cir. 1989); *see also Harbert / Lummus*, 142 F.3d at 1433 (holding that "agency procedures must be followed before a binding contract can be formed"). Mr. Leon-Munoz's telephone request for trucks, in violation of FEMA's rules for spot bids, could not bind the agency. *See Harbert / Lummus*, 142 F.3d at 1432 ("It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority.").

10

Second, the facts as alleged show that Kidston anticipated a written bill of lading following Mr. Kidston's phone call with Mr. Leon-Munoz. Mr. Kidston asked about the bill of lading at least twice. ECF No. 40-1 at 8. "Oral understandings which contemplate the finalization of the legal obligations in a written form are not contracts in themselves." *SCM Corporation v. United States*, 219 Ct. Cl. 459, 464 (1979).

Third, Kidston's complaint independently shows a lack of mutual intent to contract. Kidston understood that FEMA awarded the spot bid to another provider, KCH Transportation. ECF No. 40 at 2 [¶6]; ECF No. 40-1 at 6. Mr. Leon-Munoz never issued a bill of lading to Kidston. Mr. Leon-Munoz asked Mr. Kidston to "have [the] driver leave" after the driver arrived at the distribution center without the required bill of lading. ECF No. 40-1 at 9; *see also* ECF No. 40 at 3 [¶11]; ECF No. 41 at 8. And Mr. Leon-Munoz's supervisor told Mr. Kidston that FEMA had "it covered." ECF No. 40-1 at 9; ECF No. 41 at 9. Kidston has no bill of lading reflecting an agreed-upon price. ECF No. 41 at 9 n.3. Those facts show that FEMA lacked intent to contract with Kidston; the facts do not support the verbal contract that Kidston alleges.

*            *            *

Kidston has not alleged that a valid contract—written or verbal—exists.

## B.    Kidston cannot plausibly allege a breach of contract because FEMA can cancel an order at any time

In the alternative, even if Kidston and FEMA had entered into a contract, Kidston cannot plausibly allege breach because FEMA's rules provide that the agency may "elect[] to cancel a transportation order after a [provider] has arrived at the origin to pick up [the] load." *FEMA Uniform Rules Tariff*, § 3.13 (2023). After cancelling, FEMA must "reimburse the [provider] $210.00 for each truck" that arrived but was not used. *Id*. The plain language of FEMA's rules gives it the authority to cancel a contract at any time, as long as it reimburses the contractor.

11

Here, FEMA paid Kidston at the correct rate for the one truck Kidston sent. ECF No. 40-1 at 10-11; ECF No. 40-3. The government's decision to terminate the contract for convenience, under the terms FEMA's rules provide, cannot result in a breach of contract. *See Krygoski Construction Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (holding that, absent bad faith, the government's termination of a contract for convenience does not give rise to a breach-of-contract claim).

### C. Kidston has not plausibly alleged a breach of the implied duty of good faith and fair dealing

In response to the government's motion to dismiss, Kidston argues that FEMA "induced Kidston to provide trucking services and subsequently cancelled the [initial bill of lading] with a [truck-ordered-not-used bill of lading] for the misleading purpose of granting that trucking service to a different [provider] in direct conflict with the rights that Kidston had bargained for." ECF No. 42 at 7. Kidston argues that this is "exactly the type of improper 'bait and switch' behavior that has been found to be a breach of the implied duty of good-faith and fair dealing." *Id.*

But, absent a contract, claims "against the Government for misfeasance and misconduct" are considered tort claims. *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988); *see Awad v. United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002) (drawing the distinction between tort claims stemming from a breach of contract and those independent of a government contract). This court "lacks jurisdiction over tort actions against the United States." *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997); *see* 28 U.S.C. § 1491(a). Thus, Kidston's allegation that FEMA induced Kidston into sending a driver solely to convince Kidston's driver to work for another provider is at best a tort claim over which this court has no jurisdiction.

Kidston's allegations about the implied duty of good faith and fair dealing are less about its contract with FEMA and more about FEMA's alleged interference with the contract between

12

Kidston and the driver. Kidston alleges that FEMA officers interfered with Kidston's contractual relationship with its driver by inducing the driver to switch companies and work for another company. ECF No. 42 at 2-3, 7. That is a claim sounding in tort and lies outside this court's jurisdiction. *See, e.g.*, Restatement (Second) of Torts § 766, Intentional Interference with Another's Performance of His Own Contract (Am. L. Inst. 1979) (labeling an action as tortious interference when one person "intentionally and improperly interferes with the performance of a contract … between another and a third person, by inducing or otherwise causing the third person not to perform the contract"); *Schaeffer v. United States*, No. 20-1498, 2021 WL 3642356, at *6 (Fed. Cl. Aug. 17, 2021) (Because, as "the name would suggest, tortious interference is a claim sounding in tort," this court lacks jurisdiction.).

## III.    Conclusion

For the reasons stated above, this court **grants** the government's motion to dismiss and **dismisses** Kidston's complaint. The clerk of the court shall enter judgment accordingly.

**IT IS SO ORDERED.**

/s/ Molly R. Silfen
MOLLY R. SILFEN
Judge